621 A.2d 864

**BALTIMORE COUNTY, Maryland**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 77, Sept. Term, 1992.

Court of Appeals of Maryland.

March 25, 1993.

Roger D. Redden (Martin E. Wolf, Piper & Marbury, all on brief), Baltimore, and (H. Emslie Parks, County Atty. and Michael J. Moran, Associate County Atty., on brief), Towson, for petitioner.

Edward F. Shea, Jr. (Jeral A. Milton, Kaplan, Heyman, Greenberg, Engleman & Belgrad, P.A., all on brief), and (Neal M. Janey, Ambrose T. Hartman, William R. Phelan, Jr., Valentine A. Kogler, Jr., all on brief), Baltimore, for respondent.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, ROBERT M. BELL and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired, specially assigned), JJ.

KARWACKI, Judge.

This appeal arises out of a dispute between the Mayor and City Council of Baltimore ("the City") and Baltimore County ("the County") over the method for calculating the cost to the City of supplying water to consumers in Baltimore County. On August 22, 1991, that issue was resolved by an arbitration board, which also ruled that the new method of determining the City's costs should be employed retroactively. The arbitrators directed that the parties compute the additional cost due the City under the new method from July 1, 1983 through June 30, 1990, within sixty days of their decision. They then directed that the County pay that amount to the City together with interest at 6%, which would begin to run sixty days from the date of their decision.

The County moved to vacate the retroactive portion of the award. When the Circuit Court for Baltimore County (John F. Fader, II, J.) denied that motion and confirmed the arbitration award in its entirety on motion by the City, the County appealed to the Court of Special Appeals. Prior to consideration of the case by the intermediate appellate court, we granted the City's petition for certiorari.

I.

Baltimore City provides water for certain consumers in Anne Arundel County, Baltimore County, Carroll County, Howard County, and has recently entered into an agreement to provide raw water from its reservoirs to parts of Harford County at some point in the future. As of June, 1990, the City's system served over 1.5 million people and serves approximately 97 billion gallons of water annually. Approximately 56 percent of usage is within the City. The remaining 44 percent is used in the surrounding counties.

The City has estimated that by the year 2000 the City will use only 50 percent of the water and will continue to reduce its share as that of the counties which it serves expands. The City's water demand has declined from 161.7 million gallons per day in 1950 to 138.9 million gallons per day in 1988. Baltimore County's demand has increased from 17.7 million gallons per day in 1950 to 101.3 million gallons per day in 1988. This shift is further reflected on a volumetric percentage basis. In 1950, the City used 89.9 percent of the total system demand, while the County used 9.8 percent. In 1988, the City used 52.5 percent compared to the County's 38.3 percent.

The City began providing water to Baltimore County in the early part of this century. In 1918, the City extended its geographical boundaries by annexation, encompassing parts of the County which in the past had been supplied water by nine separate private water companies. Because the private systems were incompatible with the City's system, the City was required to make extensive upgrades of the previously privately owned systems at its own expense. In 1922, the General Assembly enacted the first legislation permitting the County to connect into the City's water mains at the County's expense to serve those communities in the County adjacent to the City line. Ch. 526 of the Acts of 1922. The charge to the County for this service was the sum of the actual cost of delivering the water to connection points and the actual cost of water purification plus a five percent mark up based on costs determined by the Public Service Commission.

Chapter 539 of the Acts of 1924, the Metropolitan District Act, was enacted, creating the Metropolitan District of Baltimore County contiguous to the City. Under that Act, the City was required to extend, at cost plus overhead, water supply lines into the metropolitan district as requested by the County. Operating control was vested in the City with authority to establish rates for consumers in that district with approval of the Public Service Commission.

In 1931, a jointly sponsored cost study of the water system was completed by Ezra B. Whitman for the City and Dr. Abel Wolman for the County. The study recommended that cost allocation for both fixed and variable costs be placed on a volumetric basis with fixed costs determined at original cost, reflected by outstanding indebtedness. The volumetric allocation was thought appropriate because the County customers used only two percent of the system's water.

In 1945, the General Assembly repealed and reenacted with amendments the Metropolitan District Act, which had been codified as Article 3, § 329 *et seq.* of the Public Local Laws of Maryland (1930). As amended, § 332(c) of the Act provided:

"The Mayor and City Council of Baltimore shall furnish water to the Metropolitan District of Baltimore County at cost and entirely without profit or loss. The [County] Commissioners and the Mayor and City Council of Baltimore shall, from time to time, determine by agreement, if possible, the costs to Baltimore City of furnishing water to consumers in the Metropolitan District of Baltimore County. If no agreement is reached, then cost shall be determined by arbitration in the manner herein provided in Section 329.[1] Cost, however, determined, shall be subject to revision from time to time by agreement of the respective authorities, or by arbitration on the demand of either of them." [2]

The development boom in the County in the years following World War II led to water shortages within the metropolitan district and prompted the formation of the Board of

---

**1.** Section 329 of the Act provided for an arbitration board of three; the County and the City each were to select one arbitrator and they were to select a third arbitrator who was to be the chairperson.

**2.** In 1956, the County adopted a Home Rule Charter, and in subsequent codifications of § 332(c), and the other sections of Metropolitan District Act the references to the "County Commissioners" has been changed to "County." This section is now codified as part of § 35–141 of the Baltimore County Code (1991).

Advisory Engineers on Future Water Supply in 1951. In 1953, that Board reported that the water shortages were not of recent origin, but rather were the result of poor supply conditions in the County dating from before the time the City began operating the water distribution systems which had been privately owned. The study group found that the capacity of the City-financed extension of feeder mains built into the County to interconnect and reinforce the water distribution systems in and out of the County communities was being outstripped by the area's residential and industrial growth. The Susquehanna River Supply project was undertaken to address the recommendations of the report which lamented:

"[I]f the Baltimore water distribution system is not immediately improved so that suitable water pressure can be maintained under peak demand conditions, the expected industrial development commensurate with the obvious industrial potential will not materialize. New industries will be discouraged and expansion of present manufacturing and processing plants will be deterred."

After the enactment of Chapter 1017 of the Acts of 1945, *supra*, the City and the County had agreed informally on the method for determining the cost to the City of furnishing water to County residents, modifying the determination from time to time. On September 20, 1972, the accumulated informal understandings were memorialized in a formal agreement apportioning responsibility for operation and repair of the total water system. Under the 1972 Agreement, a debt service method was employed to determine the City's cost of supplying water to consumers in the metropolitan district.

Shortly after execution of the 1972 Agreement, the then chief of the Water Engineering Division of the City expressed dissatisfaction with its terms. As a result, the City engaged the engineering firm of Black and Vaetch to review it. That firm submitted its report in February, 1978, recommending that the City adopt a utility basis approach

to provide a return on the annual cost of capital devoted to water service.

The report found the City needed to increase annual revenue by two to three percent to meet anticipated future expenses and that the adjustment should come from the adjacent counties, otherwise the revenue deficiency would have to be met by increasing revenue charges to City consumers. Relying on this report, then Mayor William Donald Schaefer wrote to the county executives of Anne Arundel, Baltimore, and Howard Counties, then the only counties where the City supplied water, stating:

"[O]wing to a continual decline in the City's population and water consumption, we believe the [methods which have evolved during the last 20 years for apportioning costs of new facilities] are now inequitable. "[Noting that the City had for more than 100 years financed construction of the water system through the sale of its general obligation bonds and that these past investments have purchased]" a capacity in the system far beyond the expected City needs, the City cannot justify any further expenditures to build additional capacity that will be used to meet growing water demands in the Counties, nor can the City permit the counties to utilize existing system capacity without compensation."

*Id.* at 29–30.

On June 16, 1981, the then County Executive of Baltimore County replied by letter opposing the utility method of cost accounting, arguing that any rate of return earned in excess of the actual interest paid out by the City for County-used facilities was profit, and objecting to the depreciation schedules. On September 9, 1982, the City's Mayor responded, again urging adoption of the Black and Vaetch recommendation, and requested initiation of arbitration proceedings. By letter of October 8, 1982, the County Executive answered that arbitration appeared to be the only remaining avenue to resolution of differences over determination of cost and stated that "any change in the 1972 Water Agreement should cover events from this time for-

ward." On November 16, 1982, the City forwarded proposed amendments to the 1972 Agreement, requesting that the parties begin negotiations immediately or initiate arbitration, and concluded: "It is most important to the financial integrity of the water system that this matter be resolved at the earliest possible date."

After avoiding arbitration for four and a half years, on July 14, 1987, the County advised the City, that, contrary to its earlier agreement, it would not proceed to arbitration. The City then filed suit in the Circuit Court for Baltimore County to compel the County to arbitrate. In a December 2, 1987 order, Judge Fader ordered the County to proceed to arbitration and to select an arbitrator by January 20, 1988, the City having already informed the County of its selection. The County appealed that order. We granted the City's petition for certiorari prior to consideration of the appeal by the Court of Special Appeals. On September 15, 1988, we affirmed Judge Fader's order in an unreported opinion.

By March, 1990, the City and County had each selected an arbitrator and had agreed on a third arbitrator who would serve as chairperson. By agreement of the parties, the following issues were submitted to the arbitrators:

"A. What is the proper method, under the Metropolitan District Act, for determining the cost to Baltimore City of furnishing water to consumers in the Metropolitan District of Baltimore County.

1. Is the City's proposed use of the utility basis for determining capital costs the proper measure of Baltimore County's responsibility for its share of such costs under the Metropolitan District Act.

a. Under the utility basis, what were the values at the appropriate valuation dates of the property used and useful in furnishing water to consumers in the Metropolitan District.

b. Under the utility basis, what were the reasonable cost of capital rates at the appropriate valuation dates.

2.   Is the City's proposed allocation of operational and maintenance expenses on a functional cost basis the proper measure of determining Baltimore County's responsibility for its share of such costs under the Metropolitan District Act.

B.   What should be the effective date for implementation of the methodology proposed by the City for determining the costs to Baltimore City for furnishing water to consumers in the Metropolitan District of Baltimore County.

1.   What is the current value of the amounts due to the City counting from the date of implementation of the methodology proposed by the City.

2.   What is the appropriate rate of interest applicable to amounts due the City from the date of the decision of the Board of Arbitration to the date of payment."

The direct testimony of each party's witnesses was submitted in writing and hearings to cross-examine those witnesses were held in December of 1990.  Oral argument was presented by the parties on May 8, 1991.  The arbitrators rendered their written decision on August 22, 1991.  They unanimously agreed, *inter alia*, that (1) the utility basis was the appropriate method, under the Metropolitan District Act, for determining the cost to the City of furnishing water to consumers in the metropolitan district of the County; and (2) July 1, 1983 should be the effective date for implementation of that methodology.  The effect of the award implementing the utility methodology as of July 1, 1983, was an approximate $10.3 million liability of the County to the City.

## II.

"Arbitration is a matter of contract which the parties should be allowed to conduct in accordance with their agreement."  *Gold Coast Mall v. Larmar Corp.*, 298 Md. 96, 103, 468 A.2d 91, 95 (1983).  *See Charles J. Frank, Inc. v. Assoc. Jewish Charities*, 294 Md. 443, 448, 450 A.2d 1304,

1306 (1982); *C.W. Jackson & Assoc. v. Brooks,* 289 Md. 658, 666, 426 A.2d 378, 382 (1981); *Continental Milling & Feed Co. v. Doughnut Corp.,* 186 Md. 669, 675, 48 A.2d 447, 450 (1946). This Court has long held arbitration to be a "favored" method of dispute resolution in the avoidance of litigation. "Consequently, at common law, courts generally deferred to the arbitrator's findings of fact and applications of law."[3] *Board of Education v. Prince George's County Educators' Ass'n,* 309 Md. 85, 98, 522 A.2d 931, 937 (1987) (citations omitted). In *Board of Education,* we cited to *Burchell v. Marsh,* 17 How. 344, 349, 15 L.Ed. 96 (1854) for an explanation of the scope of review of arbitration proceedings:

> "Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes, it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error, either in law or fact. A contrary course would be a substitution of the judgment of the chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation."

*Id.*

This Court has "firmly established as a common law principle in Maryland that mere errors of law or fact would not ordinarily furnish grounds for a court to vacate or to refuse enforcement of an arbitration award." *Id.* We have, however, drawn exceptions to the rule:

---

3. In its order of December 2, 1987, the Circuit Court determined that the arbitration was governed by common law and not by the Maryland Uniform Arbitration Act, Maryland Code (1974, 1989 Repl.Vol.) § 3–201 *et seq.* of the Courts and Judicial Proceedings Article. We affirmed that order on September 15, 1988 and it is now the law of the instant case. *Health Services Cost Review Comm'n v. Franklin Square Hospital,* 280 Md. 233, 238, 372 A.2d 1051, 1053 (1977).

"Thus an award will be vacated for fraud or for misconduct, bias, prejudice, corruption or lack of good faith on the part of the arbitrator. Moreover, a mistake by an arbitrator may be 'so gross as to evidence misconduct or fraud on his part.' In addition, an arbitration award which is contrary to a clear public policy will not be enforced."

*Id.* at [309 Md.] 100, 522 A.2d at 938. (citations omitted) Furthermore:

"A court will vacate an arbitration award if it is not within the scope of the issues submitted to arbitration. An award is also reviewable to determine whether the arbitrator failed to consider all matters submitted. Furthermore, 'a court may modify an arbitration award for a mistake of form such as an evident miscalculation of figures.' And a court will determine whether the parties had a procedurally fair hearing leading to the award."

*Id.* at 100–01, 522 A.2d at 938. (citations omitted).

*See, e.g., Messersmith, Inc. v. Barclay Townhouse Associates,* 313 Md. 652, 654 n. 2, 547 A.2d 1048, 1051 n. 2 (1988); *Anne Arundel County v. Fraternal Order of Anne Arundel Detention Officers and Personnel,* 313 Md. 98, 105–06, 543 A.2d 841, 844–45 (1988); *Amalgamated Transit Union v. MTA,* 305 Md. 380, 389, 504 A.2d 1132, 1136 (1986); *Chillum v. Button & Goode, Inc.,* 242 Md. 509, 516–17, 219 A.2d 801, 805–06 (1965); *Mayor & City Council of Baltimore v. Allied Contractors,* 236 Md. 534, 545–46, 204 A.2d 546, 552 (1964); *Nelley v. Baltimore City,* 224 Md. 1, 8–9, 166 A.2d 234, 237 (1960); *Parr Construction Co. v. Pomer,* 217 Md. 539, 543–44, 144 A.2d 69, 72 (1958); *Schreiber v. Pacific Coast Fire Ins. Co.,* 195 Md. 639, 646–47, 75 A.2d 108, 111–12 (1950); *Continental Milling and Feed Co. v. Doughnut Corp.,* 186 Md. 669, 674–677, 48 A.2d 447, 449–51 (1946); *Pumphrey v. Pumphrey,* 172 Md. 323, 325–26, 191 A. 235, 236 (1937); *O'Ferrall v. De Luxe Sign Co.,* 158 Md. 544, 552, 149 A. 290, 294 (1930); *McDonald v. Real Estate Board of Baltimore City,* 155 Md. 377, 382, 142 A. 261, 263 (1928); *Dominion Marble Co. v. Morrow,* 130 Md. 255, 259–

60, 100 A. 292, 293 (1917); *Roberts Bros. v. Consumers' Can Co.*, 102 Md. 362, 368–69, 62 A. 585, 587 (1905); *Witz v. Tregallas*, 82 Md. 351, 368–69, 33 A. 718, 721–22 (1896); *Bullock v. Bergman*, 46 Md. 270, 278–80 (1877); *Garitee v. Carter*, 16 Md. 309, 312 (1860); *Roloson v. Carson*, 8 Md. 208, 221–25 (1855); *Ebert v. Ebert*, 5 Md. 353 (1854); *Lewis v. Burgess*, 5 Gill 129 (1847); *Caton v. MacTavish*, 10 G. & J. 193 (1838); *Cromwell v. Owings*, 6 H. & J. 10 (1823).

## III.

■ The County contends that implementing the new method of determining the City's cost of supplying water to consumers in the metropolitan district as of July 1, 1983, violates public policy. This is so, according to the County, because such action by the arbitrators constitutes retroactive ratemaking. Alternatively, the County argues that by providing for retroactive application of the new methodology, the arbitrators exceeded the scope of their authority. We find no merit in either proposition.

In ruling that the new method of determining the City's cost should be implemented as of July 1, 1983 the arbitrators reasoned:

The evidence clearly shows that there were six years of delay from the time the County first agreed to an arbitration until the County finally proceeded to appoint its arbitrator. The County delayed the arbitration proceeding through failure to respond to the City's requests, retracting its earlier agreement to arbitrate and forcing the City to take legal action to have the court order the County to proceed to arbitration. During this time, in compliance with the provisions of the 1945 Act, the City met its obligations and continued to provide water service to the Metropolitan District without payment by the County of the full cost thereof.... Accordingly, to order the implementation of the City's proposal, but to make it prospective only, would be to reward the County's fiscal irresponsibility while penalizing the City for living up to its legal obligations and its good faith efforts to resolve

the disagreement through arbitration.... Any harm to the County has been of the County's own making through its repeated failures to proceed to arbitration. As explained previously, the County sets the rates to be paid by residents of the Metropolitan District (City Ex. No. 6, p. 19) and those rates are billed and collected by the City; if those rates result in higher revenues than what is determined to be the cost of service for that year, the difference is refunded by the City to the County (City Ex. No. 6, p. 19). City Exhibit No. 12 shows that for all but two of the last ten years the City has refunded substantial amounts of money to the County:

### BALTIMORE CITY–COUNTY SETTLEMENT

|  | Revenue | Expenses | Over/(Under) |
|---|---|---|---|
| 1980 | $10,552,229.00 | $ 9,368,634.40 | $1,183,594.60 |
| 1981 | 11,964,517.94 | 10,187,936/68 | 1,776,581.26 |
| 1982 | 11,863,241.33 | 11,022,585.44 | 840,655.89 |
| 1983 | 11,504,497.11 | 11,841,123.12 | ( 336,626.01) |
| 1984 | 12,531,153.34 | 12,288,838.70 | 242,314.64 |
| 1985 | 11,968,852.06 | 13,423,209.77 | (1,454,357.71) |
| 1986 | 16,606,319.41 | 15,078,692.26 | 1,527,627.15 |
| 1987 | 18,629,773.30 | 15,157,212.86 | 3,472,560.44 |
| 1988 | 18,488,378.71 | 15,382,186.93 | 3,106,191.78 |
| 1989 | 18,630,714.51 | 16,747,000.64 | 1,883,713.87 |
| 1990 | 23,002,670.79 | 18,001,670.79 | 5,000,000.00EST |

. . .

While the City has proposed that the award be made retroactive to 1982, it is to be noted that the City's Water Division operates on a fiscal year beginning July 1st of each calendar year. Then, the City's demand for arbitration was by letter dated September 9, 1982 and the County's letter of response agreeing to arbitration was dated October 9, 1982. A fair assumption is that ensuing arbitration proceedings would have pre-empted the time until July 1, 1983 and, also, that a prompt award then would not have been retroactive, but prospective.

By virtue of § 332(c) of the Metropolitan District Act the City was entitled to be compensated for its cost of furnish-

ing water to the metropolitan district. It is equally clear that the Act required the parties to submit the issue of cost determination to arbitration if they could not reach an agreement. Despite these provisions the County resisted arbitration from October 8, 1982, when its county executive agreed that arbitration of the issue

"appears to be the only remaining course to resolve our substantial differences on what will constitute a proper way of setting a cost on water utility operations and improvements benefitting Baltimore County"

and represented that "any change in the 1972 Water Agreement should cover events from this time forward." Consequently, the arbitrator did no more than enforce the understanding of the parties that any modification of the method of cost determination should be effective as of the date when Baltimore County agreed to arbitration.

The County's reliance on the prohibition against retroactive ratemaking which is derived from our Public Service Commission Law, Md.Code (1957, 1991 Repl.Vol.) Article 78, is misplaced. The general prohibition against retroactive ratemaking by a public utility regulatory commission is grounded upon the principle that a regulated public utility is bound by its filed tariffs and must charge the rate set forth therein. *Spintman v. Chesapeake & Potomac Telephone Co.*, 254 Md. 423, 429–30, 255 A.2d 304, 308 (1969). Unlike a public utility which looks to a regulating commission for authority to stabilize rates which will insure that it will recover its cost in supplying a service, the City under the Metropolitan District Act is restricted when seeking to recover the cost of water it supplies to reaching an agreement with the County and failing agreement by proceeding to arbitration.

Furthermore, the general prohibition against retroactive ratemaking applicable to the Public Service Commission is subject to an exception where setting such a retroactive rate is expressly authorized by statute. *Baltimore Gas & Electric Co. v. Public Service Commission*, 305 Md.

145, 157–58, 501 A.2d 1307, 1313 (1986); *Spintman v. Chesapeake & Potomac Telephone Co.*, 254 Md. at 430, 255 A.2d at 308; *Public Service Commission v. Delmarva Power & Light Co.*, 42 Md.App. 492, 503–04, 400 A.2d 1147, 1153, *cert. denied*, 286 Md. 746 (1979). Section 332(b) of the Metropolitan District Act governs the setting of rates to be charged to consumers residing in the metropolitan district. That section provides:

"The rates to be charged by Baltimore City for furnishing water to consumers in Baltimore County shall be established by agreement between the City of Baltimore and the Commissioners, subject to approval by the Public Service Commission of Maryland. In case of disagreement as to the rates to be fixed, the Public Service Commission of Maryland, shall, upon the application of the Commissioners, review the rates proposed by the City of Baltimore, and the findings of the Public Service Commission shall be final, except that there may be an appeal to the Courts by either party, as is provided by law in the case of rates for Public Service Corporations fixed by the Public Service Commission. The rates, however, established, shall be subject to revision from time to time by agreement of the City of Baltimore and the Commissioners, subject to the approval of the Public Service Commission. In case of disagreement as to a rate revision, either the City or the Commissioners may institute proceedings before the Public Service Commission for a review of the existing rates, with the subsequent right of appeal to the Courts as herein provided." [4]

Pursuant to this section, the County with the agreement of the City has set the rates to be charged consumers within the metropolitan district, and those rates are billed and collected by the City. Section 332(d) of the Metropolitan District Act contemplates the possibility that revenues collected from consumers within the metropolitan district

---

4. Section 332(b) is presently codified as § 35–140 of the Baltimore County Code (1991).

might be less than the City's cost of supplying water to the district. It provides:

> "The Mayor and City Council of Baltimore shall maintain proper records and books of account to adequately and correctly reflect the amount of all income received from furnishing water service to consumers in Baltimore County; and annually shall render a statement to the Commissioners showing the total revenues received from Baltimore County water consumers during the period covered by the statement and the actual cost of furnishing such water, determined as hereinbefore provided. The excess of the income over actual cost shall be transmitted by said Mayor and City Council of Baltimore with the statement to the Commissioners, to be expended by them in furtherance of the uses and purposes authorized by the Metropolitan District Act. If in any year the revenues aforesaid should be less than the cost, the deficit shall be deductible from future payments accruing to the Commissioners and shall be taken into consideration in any revision of consumer rates. The account books and accounts relating to consumers of water in Baltimore County shall be subject to audit by agents of the Commissioners upon request of said Commissioners." [5]

Finally, we hold that the arbitrators decision that the new method for determining the City's cost of supplying water to the metropolitan district should be implemented as of July 1, 1983 was within the scope of the issues submitted for arbitration. That issue was expressly submitted by the City and the County by joint stipulation, *supra*. Consequently, the issue was one which the arbitrators were bound to decide. *Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.*, 281 Md. 712, 721–22, 382 A.2d 555, 559–60 (1978); *Witz v. Tregallas*, 82 Md. 351, 367, 33 A. 718, 721 (1896); *Snyder v. Berliner Construction Co., Inc.*, 79

---

5. Section 332(d) is now codified as part of § 35–141 of the Baltimore County Code (1991).

Md.App. 29, 36–37, 555 A.2d 523, 526, *cert. denied,* 316 Md. 550, 560 A.2d 1118 (1989). Likewise the parties jointly submitted the issue of

"What is the current value of the amounts due to the City counting from the date of implementation of the methodology proposed by the City."

Again, the arbitrators were required to resolve that issue, and we reject the County's suggestion that the award of approximately $10.3 million to the City was in the nature of a prohibited punitive award of damages. The award did nothing more than compensate the City for the cost of furnishing water to the metropolitan district for the period during which the County delayed the arbitration mandated by the Metropolitan District Act. Arbitrators have broad discretion in fashioning a remedy for the injustice which is found to have occurred. *Amalgamated Transit Union v. Mass Transit Administration,* 305 Md. 380, 390, 504 A.2d 1132, 1137 (1986); *International Ass'n of Firefighters v. Prince George's County,* 74 Md.App. 438, 448, 538 A.2d 329, 333–34 (1988).

Under the Metropolitan District Act the City was required to supply water to consumers in the metropolitan district of Baltimore County "at cost and entirely without profit or loss." The arbitrators determined that the City was not fully compensated for the water supplied from July 1, 1983 through June 30, 1990. The arbitrators properly remedied that injustice by their award to the City from the County which had caused the City's loss through what the arbitrators determined was an unreasonable refusal to arbitrate the proper method of determining the City's costs.

JUDGMENT AFFIRMED WITH COSTS.