644 A.2d 1063

The AMERICAN UNION OF BAPTISTS, INC. et al.

v.

The TRUSTEES OF the PARTICULAR PRIMITIVE BAPTIST CHURCH AT BLACK ROCK, INC. et al.

No. 154, Sept. Term, 1993.

Court of Appeals of Maryland.

June 28, 1994.

Reconsideration Denied Aug. 19, 1994.

James L. Otway (Anthenelli & Otway, all on brief), Salisbury, for petitioner.

C. William Clark (Anthony T. Bartlett, argued, Ruppersberger, Clark and Mister, all on brief), Timonium, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

This case requires us to step once again into the complexities of the relationship between church and state. At issue is the ownership and control of certain church property. Two groups claim to have validly elected the Board of Trustees of the Particular Primitive Baptist Church at Black Rock, Inc. The petitioner, the American Union of Baptists, Inc. (AUB), is a religious corporation located in Salisbury, Wicomico County, Maryland.[1] The respondent, the Trustees of the Particular Primitive Baptist Church at Black Rock, Inc. (Black Rock), is a religious corporation located in Butler, Baltimore County, Maryland.

The background to this dispute is described in the opinion of the Court of Special Appeals:

---

**1.** Maryland Code (1974, 1993 Repl.Vol.), §§ 5–301 *et seq.* of the Corporations and Associations Article provides for the incorporation of local religious congregations so that such entities may hold, control, and have the power to dispose of property under the laws of the state. For an explanation of Maryland's General Religious Corporation Law, see *Maryland and Va. Eldership v. Church of God at Sharpsburg*, 249 Md. 650, 241 A.2d 691 (1968) (*Eldership I*), *vacated and remanded*, 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750 (1969), and *Maryland and Va. Eldership v. Church of God at Sharpsburg*, 254 Md. 162, 254 A.2d 162 (1969) (*Eldership II*), *appeal dismissed*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).

"Black Rock was incorporated in 1891, and filed Articles of Amendment and a Restatement of its Articles of Incorporation with the State Department of Assessments and Taxation (SDAT) in 1978. In 1979, at its first annual meeting after filing Articles of Amendment, Black Rock elected a Board of Trustees. The Board of Trustees then chose Eugene F. Osborne, Sr. (Osborne) as President and George R. Welden (Welden) as Vice–President. The Board of Trustees and its officers were to serve terms of four years. At Black Rock's annual meeting in 1983, Osborne and Welden were reelected to additional terms of four years.

"Osborne called a special meeting of the Board of Trustees on December 8, 1986, to consider his motion to dissolve Black Rock. According to Osborne, Black Rock no longer existed [as a church] because its minister had died and none of its members were living.[2] After Osborne's motion failed, a group of trustees led by him (the Osborne group), filed a complaint in the Circuit Court for Baltimore County seeking the involuntary dissolution of Black Rock. The complaint was dismissed, an appeal followed, and [the Court of Special Appeals] affirmed the judgment of the circuit court [in an unreported opinion. *Osborne v. Trustees of the Particular Primitive Baptist Church of Black Rock, Inc.*]

"In May of 1987, several members of Black Rock's Board of Trustees, led by George Welden (the Welden group), called a special meeting for June 13, 1987, to elect new officers.[3] Prior to the meeting, Osborne notified the Welden group that any action taken at the special meeting would be invalid because Black Rock's bylaws provided that

---

**2.** Apparently, Osborne does not consider the current congregation of Black Rock to be "members" of the church because they allegedly have an "open communion." The record does not divulge, and we need not discern, the precise meaning of "open communion;" it will suffice to recognize that it is a matter of church doctrine.

**3.** Respondents assert that the special meeting was called only after Osborne, then president of the Board of Trustees, failed to call an annual meeting and deliver an Annual Report to the Congregation, in contravention of his duties under Black Rock's bylaws.

only the president could call a special meeting. Nevertheless the special meeting was held, with only the Welden group present. As expected, Osborne was removed as president and replaced by Welden.

"The Osborne group retaliated, continuing to assert that Black Rock no longer existed because it had no "members," and that Ebenezer Primitive, or Old School Baptist Church of Baltimore City (Ebenezer), now controlled Black Rock.[4]

"Ebenezer merged with AUB on July 23, 1987. At its first annual meeting, AUB passed a resolution authorizing it to elect a Board of Trustees for Black Rock. A Board of Trustees for Black Rock was then elected and Osborne was installed as its president. After it had been elected, the Board passed a resolution merging Black Rock into AUB. Articles of Merger were filed with the SDAT.

"On July 12, 1988, Black Rock filed a complaint in the Circuit Court for Baltimore City seeking a declaration of Black Rock's properly elected Board of Trustees. Black Rock also sought an order directing the SDAT to strike the Articles of Merger filed by AUB. In addition, Black Rock asked the circuit court to enjoin AUB from attempting to transfer Black Rock's property and assets. After Black Rock's complaint was transferred to the Circuit Court for Wicomico County, the judicial proceedings were stayed pending arbitration. Following an arbitration award in favor of Black Rock, AUB moved to vacate the award and Black Rock moved for summary judgment. The circuit

---

**4.** Ebenezer's (and hence, AUB's) claim to control of Black Rock is premised on the characterization of Black Rock Church as "ecclesiastically extinct" due to the death of its last "member" in 1972. Apparently, both Black Rock and Ebenezer were at one time members of the Baltimore Association of Baptist Churches, an organization which had been in existence since the 1920s. Under petitioner's theory, the control of Black Rock and its property became vested solely in Ebenezer when Black Rock became "extinct" in 1972, because, "pursuant to and consistent with the recognized practice of the denomination of Primitive Baptists," Ebenezer was the "surviving sister church of the same religious persuasion."

court denied AUB's motion and granted summary judgment in favor of Black Rock."

*American Baptists v. Trustees,* 98 Md.App. 10, 12–14, 632 A.2d 226, 227 (1993) (footnotes omitted). The Court of Special Appeals affirmed the judgment of the circuit court after it determined that an arbitration award entered under Maryland Code (1974, 1993 Repl.Vol.), § 5–310 of the Corporations and Associations Article was not subject to judicial review.[5] The intermediate appellate court stated:

"It is evident from the Court's rationale in [*Maryland & Va.*] *Eldership* [*of Churches of God v. Church of God at Sharpsburg, Inc.,* 249 Md. 650, 241 A.2d 691 (1968)] that § 5–310 [of the Corporations and Associations Article] was enacted so that it would be unnecessary for courts to resolve issues of church polity that inevitably arise in disputed church elections. Thus, it follows that the word 'final' in § 5–310(c) has a different meaning than it has in a dispute not involving issues of church polity. As we see it, when using the word 'final' in § 5–310(c), the legislature intended that such an award not be subject to judicial review."

*American Baptists v. Trustees,* 98 Md.App. at 16, 632 A.2d at 228. The Court of Special Appeals addressed the merits of

---

**5.** Md.Code (1974, 1993 Repl.Vol.), § 5–310 of the Corporations & Associations Article provides:

"**§ 5–310. Arbitration of contested election.**

(a) *Selection of arbitrators.*—If any contest arises over the voting rights or the fair conduct of an election:

(1) Each contending party shall appoint one individual from among the members of a neighboring church of the same religious persuasion or, if there is no such church, from among the members of any other church; and

(2) The two appointed individuals shall select a third, similarly qualified, individual.

(b) *Location of arbitration.*—The arbitrators shall meet at the place where the contest arose and hear and determine the matter.

(c) *Final determination of arbitration.*—The judgment or award of a majority of the arbitrators, signed and acknowledged by them, is final."

The constitutionality of the statute and of the appointment of arbitrators thereunder was not challenged, either before this Court or in proceedings below.

the case only briefly, stating that even if the award had been subject to judicial review, the court would have nonetheless "affirmed the judgment of the circuit court, because the award of the arbitrators was not 'completely irrational.'" *Id.* at 17–18, 632 A.2d at 229.

In its petition for certiorari, AUB asserted that the Court of Special Appeals erred in its holding that an arbitration award entered under § 5–310 is not subject to judicial review. We granted AUB's petition, and although we agree that the intermediate appellate court erred in its interpretation of § 5–310(c), we nevertheless agree with that court that the award in the instant case is not subject to judicial review, and we will affirm the judgment of the lower court.

## I.

■ AUB contends, among other things, that it is assured a right of review by Maryland's Uniform Arbitration Act. Md. Code (1974, 1989 Repl.Vol.), § 3–201 *et seq.* of the Courts Article. Because the two parties were unable to agree on the third arbitrator pursuant to § 5–310(a)(2) of the Corporations and Associations Article, the court appointed the third arbitrator in this dispute. AUB contends that this action is sufficient to bring the matter within the Uniform Arbitration Act.[6] In answer to this contention, the Court of Special Appeals stated that "it is clear from the record before us that arbitration, in this case, was conducted pursuant to §§ 5–301, *et seq.*, [of the Corporations and Associations Article].... We do not believe that the action of the circuit court [in appointing a third

---

6. Md.Code (1974, 1989 Repl.Vol.), § 3–211(c) of the Courts Article provides:

"**§ 3–211. Appointment of arbitrators.**
    (c) *Appointment by court.*—A court shall appoint one or more arbitrators if:
    (1) The arbitration agreement does not provide a method of appointment;
    (2) The agreed method fails or for any reason cannot be followed; or
    (3) An appointed arbitrator fails or is unable to act and his successor has not been appointed."

arbitrator after the two parties were deadlocked] brought arbitration under [the Uniform Act]." *American Baptists,* 98 Md.App. at 17, 632 A.2d at 229. We agree with the intermediate appellate court's analysis. Under the Uniform Act, a court derives jurisdiction to review and enforce an arbitration award from the existence of an agreement between the parties. Md.Code (1974, 1989 Repl.Vol.) § 3–202 of the Courts Article. The instant arbitration, however, does not arise from an agreement between the parties to settle their disputes. Rather, the arbitration in the case *sub judice* is required by statute; the parties have no choice but to arbitrate this dispute in the precise manner prescribed by § 5–310 of the Corporations and Associations Article. As such, it is not subject to the strictures of the Uniform Arbitration Act. Rather, the standard for judicial review is governed by common law arbitration rules. *See Baltimore County v. City of Baltimore,* 329 Md. 692, 701 n. 3, 621 A.2d 864, 868 n. 3 (1993) (arbitration between city and county which was mandated by statute was governed by common law and not by the Maryland Uniform Arbitration Act). *See also* James R. Madison, *In Search of a Standard for Judicial Review of Legal Error in Commercial Arbitration Awards,* 21 Golden Gate U.L.Rev. 245 (1991) (although courts should refrain from reviewing award when parties of relatively equal bargaining strength agree to arbitration, a different rule is appropriate where arbitration is essentially forced on a party, as when mandated by statute).

█ We will turn, then, to the common law grounds for judicial review of an arbitration award. This Court has long held arbitration to be a favored method of dispute resolution; consequently, we have "generally deferred to the arbitrator's findings of fact and applications of law." *Baltimore County v. City of Baltimore, supra,* 329 Md. at 701, 621 A.2d at 868, quoting *Board of Education v. Prince George's County Educators' Assoc.,* 309 Md. 85, 98, 522 A.2d 931, 937 (1987). There is nevertheless ample precedent for reviewing such awards under certain conditions. After reviewing the history of judicial review of arbitration awards in Maryland, Judge Eldridge,

writing for the Court in *Board of Education,* enumerated several instances in which review would be warranted and summarized the standard thus:

> Under Maryland common law standards for reviewing arbitration awards ... we hold that an award is subject to being vacated for a 'palpable mistake of law or fact ... apparent on the face of the award' or for a 'mistake so gross as to work manifest injustice.' "

309 Md. at 105, 522 A.2d at 941.

It is clear from this history, then, that unless specifically prohibited by § 5–310 of the Corporations and Associations Article, an arbitration award made under that section is reviewable by a court. The Court of Special Appeals found that such a specific prohibition did exist in the legislature's use of the word "final," contending that "the word 'final' in § 5–310(c) has a different meaning than it has in a dispute not involving issues of church polity."

We frankly can find no support for this construction of the term "final." Ordinarily, the term "final" does not preclude judicial review. In fact, achievement of a "final" judgment is, with few exceptions, a prerequisite to judicial review. *See, e.g., Popham v. State Farm,* 333 Md. 136, 142, 634 A.2d 28, 31 (1993) ("Unless an appeal is from a final judgment, the appellate court does not acquire subject matter jurisdiction to review it"); *National Glass v. J.C. Penney Properties,* 329 Md. 300, 619 A.2d 528 (1993) ("As a general rule an appeal will lie only from a final judgment"); Md.Code (1974, 1989 Repl. Vol.), § 12–301 of the Courts Article. Certainly, under the Uniform Act, the use of the term "final" does not preclude judicial review: § 3–215 of the Courts Article specifies that a majority of the arbitrators may render a final award, and §§ 3–223 and 3–224 enumerate specific circumstances under which a "final" arbitration award may be corrected, modified, or vacated by a court. Although this case is not governed by the Uniform Act, we see no reason to apply a different meaning to the term "final" under the common law standard. In fact, we recently reviewed a "final" arbitration award under

the common law standard in *Baltimore County v. City of Baltimore, supra.* *Baltimore County* is similar to the case *sub judice* insofar as it arose from a motion to vacate a portion of an arbitration award. There, as here, the arbitration proceeding was conducted pursuant to a statutory mandate as opposed to a bilateral agreement to arbitrate. *Id.,* 329 Md. at 696 n. 1, 621 A.2d at 866 n. 1. Moreover, the provisions governing the proceeding in *Baltimore County* provided that "the written decision of the majority of the board or arbitrators shall be final and binding upon both parties." § 35–133 of the Baltimore County Code (1988 & Supp.1994). Notwithstanding the use of the term "final" in the statute, we did review the award under the common law standard. We applied the deferential standard of review discussed above, and we affirmed the judgment of the circuit court, which had in turn affirmed the arbitration award in its entirety.

We see no reason why "final" should be treated differently in this statute than elsewhere. The Court of Special Appeals apparently based its conclusion to the contrary on its perception that "issues of church polity ... *inevitably* arise in the case of disputed church elections." *American Baptists,* 98 Md.App. at 16, 632 A.2d at 228 (emphasis added). This conclusion rests on a faulty premise. Disputed church elections may often involve issues of church polity, but not necessarily so. It is not difficult to envision, for example, a disputed church election that concerns allegations of voter fraud, ballot-box stuffing, incorrectly printed ballots, or other misdeeds that are quite secular in nature. We cannot say that the legislature intended § 5–310 of the Corporations and Associations Article to prohibit courts from exercising jurisdiction over such secular matters.[7]

---

7. Even if we determined that such was the legislative intent, it is doubtful that the legislature could deprive the courts of secular jurisdiction. Although there is no question that the legislature may impose "rational conditions upon the right to turn to the courts for redress of grievances," *Attorney General v. Johnson,* 282 Md. 274, 282–83, 385 A.2d 57, 62, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978), disapproved on other grounds, *Newell v. Richards,* 323 Md. 717,

Thus, we do not agree that § 5–310 contains a blanket prohibition of judicial review of arbitration awards. Such awards may ordinarily be reviewed under the common law standard. Nevertheless, the intermediate appellate court correctly perceived that in many instances, issues of church polity will be inextricably intertwined with secular issues in contested church elections. Each set of circumstances must be evaluated on an individual basis by the court to determine whether, under the facts of that particular case, a court would be forced to wander into the "theological thicket" in order to render a decision. In such a situation, courts may indeed be prohibited from reviewing arbitration awards, not by operation of statute, but because such review would require an impermissible entangling of church and state.

## II.

The instant case involves not only a disputed election; it is also a contest for the control of Black Rock's property and assets. Courts have often been called upon to resolve disputes over church property, yet each case presents difficulties. As a practical matter, courts cannot flatly decline to address a secular dispute over title to property simply because it arose against a religious background. The late Chief Judge Richard P. Gilbert, writing for the Court of Special Appeals, recognized this and noted: "Were it otherwise, controversies ... might never be resolved, and the title to the church property would be enmeshed in a quagmire from which extrication would be nearly impossible. Title to property cannot be

---

734, 594 A.2d 1152, 1161 (1991), it may not "interfere with the judicial process by depriving litigants from raising questions involving their fundamental rights in any appropriate judicial manner, nor can it deprive the courts of the right to decide such questions in an appropriate proceeding." *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 500, 331 A.2d 55, 65–55 (1975), citing *Schneider v. Pullen*, 198 Md. 64, 68, 81 A.2d 226, 228 (1951). In the case of alleged election fraud, the arbitration requirement of § 5–310 is certainly a rational condition upon the right to turn to the courts, but the legislature could not impose a blanket prohibition of all judicial review of arbitration awards resulting from application of § 5–310.

allowed to drift about in an atmosphere of uncertainty." *Calvary Pres. Church v. Presbytery,* 39 Md.App. 405, 417, 386 A.2d 357, 363 (1978). As we stated in *Maryland and Va. Eldership v. Church of God at Sharpsburg,* 249 Md. 650, 676, 241 A.2d 691, 706 (1968) (*Eldership I*), *vacated and remanded,* 393 U.S. 528, 89 S.Ct. 850, 21 L.Ed.2d 750 (1969), "Either the majority or the minority must be held to control the local church property and the equity court must make the decision so that the property rights are lawfully established by judicial process rather than by possible self-help." At the same time, a court confronted with such a dispute is under considerable constitutional constraints. The Supreme Court has stated the conflict thus:

> "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively. It is also clear, however, that 'the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice."

*Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775, 784 (1979) (citations omitted). Although the line separating those disputes which are grounded in religious doctrine from those which concern purely secular matters is often difficult to discern, we have in many cases been able to resolve church property disputes with the application of neutral principles of law. In *Hayman v. St. Martin's Evangelical Lutheran Church,* 227 Md. 338, 176 A.2d 772 (1962), for example, we interpreted the corporate charter and by-laws of a parent church and a local church that had voted to withdraw from the parent organization in order to resolve a dispute between the two over the church property. Shortly thereafter, in *Eldership I* and *Maryland and Va. Eldership v. Church of God at Sharpsburg,* 254 Md. 162, 254 A.2d 162 (1969) (*Eldership II*), *appeal dismissed,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970), we determined that Maryland's

Religious Corporation Law was a "neutral principle of law," and we examined the deeds by which the properties in question were conveyed to the local churches, the charters of the local church corporations, and the provisions contained in the constitution of the parent organization. We held that we could resolve the dispute in that case without involving the Court in any theological or doctrinal matter. *See also Babcock Mem. Pres. Ch. v. Presbytery*, 296 Md. 573, 464 A.2d 1008 (1983) (resolving interests in property by determining whether the church polity was congregational or hierarchical in nature; such an inquiry required application of neutral principles of law), *cert. denied*, 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984).

■ There are circumstances, however, under which a civil court should *not* intervene, even if a dispute centers on church property. The Supreme Court's decision in *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) illustrates such circumstances well. Under Georgia law at that time, the right to property previously used by local churches was made to turn on whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local church became affiliated with it. In *Presbyterian Church*, local churches renounced the jurisdiction and authority of the national church, asserting that the general church had departed from its original doctrine. After the general church attempted to reclaim the property of the local churches (title to which was held by the local churches themselves), the local churches filed suit in a civil court, seeking to enjoin the national church from trespassing on the property. In order to grant the injunction, however, the court would have been required to determine which doctrines were fundamental to church beliefs and whether the alleged departures from doctrine were substantial. The Supreme Court held that civil courts could not address these issues without violating the constitution. 393 U.S. at 451, 89 S.Ct. at 607, 21 L.Ed.2d at 667. We cited this decision with approval in *Polen v. Cox*, 259 Md. 25, 267 A.2d 201 (1970), concluding that "[t]he

standard [to be used by the courts in determining whether they may resolve church property disputes] must be whether the parties by the acts and documents which have governed their relationship have made it possible for a civil court to resolve control of property without the court itself having to make ecclesiastical determinations." 259 Md. at 32, 267 A.2d at 205. This is the standard that we shall apply today.

■ AUB asserts that the instant dispute requires no doctrinal inquiry, but only a review of Maryland corporate law under neutral principles of law. The record indicates otherwise, however. The crux of AUB's argument is that, because the bylaws vest the power to call meetings solely in the president of the Trustees, the June, 1987 special meeting was invalid and all actions taken there are void. At the same time, however, AUB claims that Osborne, then president of the Trustees, was under no obligation to call a meeting of the Trustees because the church no longer existed. It is clear to us that the outcome of this dispute hinges on whether, at the time of its June, 1987 special meeting, the Welden group possessed the powers granted to trustees by § 5–306 of the Corporations and Associations Article to act on behalf of the church. This, in turn, depends on whether Osborne, as president of the Trustees, failed in his duties as president by declining to call an annual meeting, thus allowing Welden, as vice president, to "assume the duties of the president" as permitted by the bylaws. If the church was extinct, then Osborne clearly had no continuing duty to call such meetings. If the church was not extinct, however, then Welden may well have possessed the power to call the meeting. The root question, then, is whether the Particular Primitive Baptist Church at Black Rock was "extinct" in 1987. The church would be deemed extinct if it had no members; the existence of members, conversely, would keep the church alive. It is well settled in this State that the determination of a membership in a church is a question well embedded in the "theological thicket" and one that will not be entertained by the civil courts. *Evans v. Shiloh Baptist Church*, 196 Md. 543, 551, 77 A.2d 160, 163 (1950). The record in this case only emphasizes

this point; Osborne's refusal to recognize the congregation of the church as "members" is apparently grounded in the fact that the congregation allegedly allows an "open communion." Clearly, the propriety *vel non* of an "open communion" in the Primitive Baptist faith is not within the purview of the civil courts. Yet, such a determination is crucial to the ability to decide whether the church had valid "members." Moreover, even if we were somehow to assume that the church was in fact "extinct," we cannot say that control of the church and its property would pass automatically to Ebenezer or AUB, as petitioner asserts. Ebenezer allegedly obtained its authority over Black Rock pursuant to the "recognized practice of the denomination of Primitive Baptists." Again, in order to decide this matter, we would be required to resolve the property disposition based on our interpretation of religious custom and polity. This we cannot do.

Because the legitimacy of the Welden group's actions depends on the question of "ecclesiastical extinction," which in turn hinges on the membership issue, this dispute cannot be resolved, despite AUB's claims to the contrary, without inquiries into the religious doctrine and custom of the Primitive Baptist faith. The constitution will not permit such inquiries, and we will therefore not review the award of the arbitrators in the instant case.

*JUDGMENT AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.*