841 A.2d 347

**FIRST BAPTIST CHURCH OF FRIENDLY, et al.**

v.

**Kathy BEESON, et al.**

No. 0112, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Feb. 2, 2004.

H. Robert Showers (Stephen S. McCloskey, Simms Showers, LLP, on the brief), Baltimore, for appellant.

Thomas F. Ellis, III, Annapolis, for appellee.

Panel: DEBORAH S. EYLER, KRAUSER and LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, Judge, Retired, Specially Assigned.

This appeal is from an interlocutory order appointing a receiver. See Maryland Code (1974, 2002 Repl.Vol.), § 12-303(3)(iv) of the Courts and Judicial Proceedings Article (CJ). Procedurally the action is, in effect, a derivative suit brought by minority members of an independent Baptist congregation against church "trustees," including the pastor. Substantively, the theory of the case, at it has evolved, is that the trial court should prohibit the defendants from disbursing the proceeds from the sale of the church building for purposes that allegedly are contrary to the corporate purposes. As explained below, we shall reverse in part and remand in part.

First Baptist Church of Friendly (the Church), one of the appellants, is a Maryland corporation chartered in 1969 under the general provisions (Part I) of the Maryland Religious Corporations statute, now codified as Maryland Code (1975, 1999 Repl.Vol.), §§ 5–301 through 5–313 of the Corporations and Associations Article (CA). Originally organized as the Anacostia Church in the District of Columbia, the congregation moved to the Town of Friendly in Prince George's County about 1969. The Anacostia Church and the Church had been members of the District of Columbia Baptist Convention, but in 1999 the Church severed its connection with that convention. The Church is recognized by the Internal Revenue

Service (IRS) as a tax-exempt religious corporation under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501.

Randy M. Kingsley, one of the defendants and appellants, has preached and taught since 1968 and has been the part-time pastor of the Church since 1985. Pastor Kingsley is also employed full time by the United States Department of Education, a job that sometimes requires him to be traveling on Sundays. When Pastor Kingsley was "called" to the Church, the membership totaled 127 people, ten of whom, including members of Pastor Kingsley's family, were active. Also joined as defendants are the appellees, Nancy Pickering, Craig Smrcina, and Eugene Walden who are three members of the Board of Trustees of the Church.[1] The Church is a nominal defendant, inasmuch as the action is brought on its behalf.

On June 6, 1999, the Church adopted a new constitution under which two weeks' notice of a special business meeting of the congregation could be given from the pulpit. Under Article VI, § II, Subsection C, ¶ 2(a) of that constitution, action by the Church could be by a majority vote of members present and voting. At a special meeting on December 2, 2001, the congregation voted, sixteen in favor to thirteen against, to sell the Church building.[2] Pursuant to that vote the trustees, on February 13, 2002, entered into a contract to sell the Church building for $900,000 to St. Paul Baptist Church of Prince George's County, Inc. (St.Paul).

The instant action was filed in the Circuit Court for Prince George's County on August 2, 2002. That same day the court (Judge Michele D. Hotten) entered a temporary restraining order (TRO) enjoining further attempts to effectuate the sale to St. Paul until a further hearing, which was set for August 21.

---

1. The Board of Trustees of the Church is the board of directors of the corporation.

2. There is no issue before us that the requisite vote of the members was other than a majority of those present and voting.

Nine plaintiffs are listed in the action.[3] Four of the plaintiffs aver that they are members of the Church but that they have been improperly removed from the roll of members by the individual defendants' "continuous course of conduct beginning with the year 2001 in an effort to railroad the congregation into agreeing to sell" the Church building. Inferentially, the other five plaintiffs are members of the Church who are considered to be active members, although there is no express allegation to that effect.[4]

The August 21, 2003 hearing on extending the TRO into a preliminary injunction was conducted by Judge James J. Lombardi. He succeeded in having the original parties enter into the following stipulation, which was signed by their respective counsel and also signed by Pastor Kingsley. It read:

> "The parties are in agreement that the proceeds of the sale shall be taken before the congregation to determine the final distribution which is to be submitted to Judge Lombardi for ratification. Judge Lombardi has the sole discretion to approve final ratification without further hearing. If ratification is denied for any reason, the parties will be contacted and a hearing will be promptly scheduled."

Concurrently with the execution of the stipulation, the court dissolved the TRO, denied the preliminary injunction, and released the TRO bond. The sale to St. Paul proceeded, netting, in round figures, $834,000.[5]

---

**3.** They are Kathy Beeson, Rebecca Carter, Wayne Coates, Nancy Justice, George Ware, Norman Delos Reyes, Evelyn Delos Reyes, Ivan Delos Reyes, and Laura Wiliford.

**4.** Nor is there any pleading that is a complaint, as such. The action was initiated by two motions, one seeking a TRO and the other seeking a preliminary injunction. The allegations of the two motions are substantially the same, and the two motions were treated by the trial court as a complaint.

**5.** St. Paul's interest was only in acquiring the property and not in the distribution of the proceeds. Accordingly, it was unnecessary for St. Paul, although an intervener defendant, to join in the stipulation.

A meeting of the Church congregation was held on September 22, 2002, at which twenty-two persons voted on the use and application of the net proceeds from the St. Paul sale.[6] The distributions described below were approved by a vote of sixteen to six. A memorandum of that meeting, which was furnished to the court by counsel for the Church, described the proposed applications of the funds.

Thereafter the court approved the disbursements as described in the memorandum. By an order dated October 29, that was not docketed until November 6, 2002, the court ordered

"that the proceeds shall be distributed as follows in accordance with the majority vote of the members of the congregation on September 22, 2002:

"1. $300,000.00 is to be placed in a church savings account for growth and any expenditures;

"2. $100,000.00 is to be given to Jewish Awareness Ministries for Missionary John Metzger;

"3. $202,000.00 is to be given to pay off the mortgage on Pastor Kingsley's home;

"4. $50,000.00 is to be given to Kingdom Building Ministries [KBM]; and

"5. $160,000.00 is to be given to pay off the mortgage on church missionary, Jeremy Kingsley."

This order disposed of all of the open issues in the action and was a final judgment.

On December 2, 2002, the plaintiffs moved for reconsideration of the court's order.[7] The motion referred to a letter of September 23, 2002, which the plaintiffs had sent to Judge Lombardi and which, they averred in their motion, was intend-

---

6. The parties agree that those plaintiffs who had been stricken from the role of active members nevertheless were free to attend and vote at the September 22, 2002 meeting.

7. The court's order dated October 29, 2002, could not operate as a final judgment until it had been docketed. Maryland Rule 2–601. Consequently, the plaintiffs' motion is a motion under Rule 2–535(a).

ed to indicate opposition to the distribution reported to the court by the Church. The court, thereupon, by order issued December 11, and faxed that day to counsel, directed an immediate stay of disbursement of the sale proceeds until hearing of the motion for reconsideration.

At that hearing, held on January 24, 2003, before Judge Lombardi, argument and testimony focused on the payments for satisfaction of the mortgages on the homes of Pastor Kingsley and of Jeremy Kingsley, who is the son of Pastor Kingsley. The defendants argued that the court would violate their and the congregation majority's First Amendment right to the free exercise of their religion if the court were to bar execution of the majority's decision.[8] The defendants further argued that the two challenged payments represented compensation for past services for which Pastor Kingsley and his son had not been adequately paid.

The court responded that the mortgage payments "raised some issues with the court [that it] felt ... were private benefit issues." It explained:

"[T]his is not church doctrine. This is what the court is doing. Whether it is a religious corporation, or any other type of corporation.

"When you are dealing with that, it is being wasted away by applying it to some private, non-religious purpose. That is clear to me."[9]

In the court's view "the petitioner[s] ha[d] made a prima facie case that at least two of these disbursements [i.e., the mortgage payoffs] are improper." It was not clear to the court, however, whether the mortgage payoffs were for a private purpose or whether they were "salary." Observing to the defendants that "[y]ou may persuade me that every dime

---

8. U.S. Const. amend. I, in relevant part reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"

9. There was evidence that the Church intended to continue conducting religious services at the home of a member of the Church.

of this is for salary that was earned, and never paid," the court invited testimony on that subject.

Pastor Kingsley and Edward Pickering, a member of the Church congregation since 1987 and treasurer since 1999, testified for the defendants. Pastor Kingsley's duties are to teach Sunday school, to conduct the Sunday morning and Sunday evening services, to visit the sick, and to comfort the grieving. He averages approximately thirty hours per week on these duties, which are the same as those of a full-time pastor. When he began with the Church, its annual budget was in the range of $20,000 to $30,000. At the time of trial the range was $50,000 to $60,000. There is no direct testimony as to Pastor Kingsley's salary in the early years of his service with the Church, but in 1999 he was making $22,000 per year, plus a disability insurance policy, and in 2001 his salary was $25,000 per year, plus insurance. The monies are paid as a housing allowance, which Mr. Pickering understands allows the payment to be tax free. Pastor Kingsley has no written contract with the Church, and his salary is set annually, based on the recommendation of the budget committee. Pastor Kingsley was free to leave and go to another church and possibly make more money, but he elected to stay with his government job and with the Church, at the amount that the Church was paying him. Pastor Kingsley never expressed to the treasurer that he expected at some point to get a bonus if the Church building were sold.[10]

Pastor Kingsley's son, Jeremy, was ordained by the Church as a minister and sent out as a missionary from the Church.

---

10. When counsel for the Church attempted to have Mr. Pickering compare Pastor Kingsley's compensation with that of similarly qualified pastors in the District of Columbia area, objection was sustained. Similarly, when Mr. Pickering attempted to testify that "many" in the congregation felt that Pastor Kingsley was undercompensated, objection was sustained. It is unclear whether these rulings were based on a lack of relevancy to the limited issue on which the court undertook to hear testimony, or on the failure to establish an adequate foundation, or both. The appellants do not seek appellate review of these evidentiary rulings. They do seek, however, review of the legal principles under which the court would determine relevancy.

He is an evangelist who concentrates on youth more than adults. A church that sends out a missionary has the responsibility to take care of that missionary. The Church, for the seven or eight years preceding the hearing, has paid Reverend Jeremy Kingsley $120 a month. He has no other employment, and his only sources of other funds are donations from individuals and an unspecified amount of support from one other church.

At the conclusion of the hearing the court ruled as follows:

"The court finds that what the church tried to do for the pastor was to give him a gift. There is not a shred of evidence that any of this money was under payment of monies for his past pastor services, or that he expected to get this money.

"In short, there was never any agreement that these monies were in lieu of or in addition to salaries, and the court rejects that argument by the church, and finds that these payments, although motivated by apparently the good intentions and good heart of some of the members of the church, were gifts that were earmarked for the individual enrichment and private benefit of the Pastor and his son.

"Accordingly, the court finds that these monies, totaling a little over $400,000, belong to the church, were illegally removed from the church's funds, and have generated the need for an accounting of all of the funds and the need for a receiver to do so."

At the conclusion of the hearing counsel for the Church advised that he believed that one of the mortgages had been paid off in the period between the dissolution of the TRO and the issuance of the stay on December 11, 2002.[11]

On February 4, 2003, the court appointed a specific attorney as receiver and delineated the duties of the receiver to be to

---

11. The brief for the appellants in this Court clarifies that $200,674 was disbursed to Pastor Kingsley's home mortgage companies and approximately $160,000 to Jeremy Kingsley's mortgage company.

"1) take possession of the assets from the sale of the property of the First Baptist Church;

"2) retrieve any assets improperly distributed;

"3) determine who and who is not a charitable beneficiary for purposes of distribution of the church assets;

"4) hold or dispose of the assets under the direction, supervision and further order of this court; and

"5) consult with the attorneys of the parties[.]"

This appeal was taken from that order. Appellants present two issues:

"1. Was the trial court legally correct in exercising subject matter jurisdiction over how a religious organization uses its funds?

"[2]. Were the proposed disbursements to Pastor Kingsley and Jeremy Kingsley, deferred compensation for past services within the meaning of applicable law?" [12]

## I. The Order

Before the issues presented can be addressed, the arguments of the parties make it necessary to determine just what the trial court ordered. First, the receiver is to take possession only of the proceeds of the sale to St. Paul and not all assets of the Church. The second through fourth paragraphs of the order, however, require clarification.

The trial court's oral ruling must be read in the context of the proceeding—an application for an injunction, followed by a conditional settlement, followed by a dispute as to whether the condition was fulfilled. There has been no plenary hearing on the merits. The purpose of appointing a receiver was to restore to, or maintain, the *status quo* as of the time of receipt

---

12. Appellants' brief presents a third issue: "Did the trial court have subject matter jurisdiction over membership criteria and membership discipline of a religious organization?" Appellants have not briefed this issue; nor is it presented by the record. We do not consider it. *See* Maryland Rule 8-504(a)(5).

of the sale proceeds and before any distributions by the Church, pending the report by the receiver.

Thus, three classes of proceeds or "assets from the sale" (¶ 1) might be involved: (1) proceeds not distributed; (2) proceeds distributed "improperly" (¶ 2); and (3) proceeds distributed, but not "improperly." The first class consists of the $300,000 reserved for the Church and the approximate $22,000 difference between the $834,000 of proceeds and the $812,000 total of the five disbursements approved at the Church meeting. The second class includes, at a minimum, $362,000 in mortgage payoffs that the trial court ruled were "improper," *i.e.*, made to a distributee "who [was] not a charitable beneficiary." The balance of the proposed disbursement—$100,000 to Jewish Awareness Ministries and $50,000 to KBM—would fall, under the order, in either class two or class three, depending on the investigation by the receiver and an ultimate ruling by the court. As to all three classes, the receiver is to hold the funds or dispose of them in accordance with further court orders. Those orders could be preceded by such court hearings as might be required.

## II. The Positions Of The Parties

The organizational model of corporations chartered for religious purposes broadly may be characterized as congregational or hierarchical. *Mt. Olive African Methodist Episcopal Church of Fruitland, Inc. v. Board of Incorporators of African Methodist Episcopal Church, Inc.,* 348 Md. 299, 314 n. 12, 703 A.2d 194, 201 n. 12 (1997) (classifying a presbyterial internal structure as hierarchical). The provision of the Church constitution, pertinent to the decision on distribution of the proceeds, is Article IV, § V, Subsection B, ¶ 5, requiring that the trustees "[b]ring any requested disbursement of more than one thousand dollars ($1,000.00) that is not a budgeted item before the church for approval."

Consequently, the appellees' position is that the majority of members of a religious corporation, organized on the congregational model, may not expend corporate assets under circumstances constituting unreasonable compensation and that a

civil court may prohibit or set aside such an expenditure. Appellees direct this argument only at the mortgage payoffs. Appellants' position is that a civil court cannot constitutionally inject itself into the internal affairs of a religious corporation. Alternatively, appellants further submit that, in this case, the challenged mortgage payoffs are reasonable "deferred" compensation.

Both parties support their positions by reference to the federal Internal Revenue Code, as if, at least from appellees' standpoint, Maryland courts directly enforce the federal tax statutes, regulations, and rulings, as interpreted by administrative and judicial decisions. The law that appellees have invoked, however, is the circuit court's equity jurisdiction to apply substantive Maryland corporation law to redress an alleged injury to the Church, and not to redress an alleged special injury to themselves, or to the public fisc, resulting from the distributions.[13]

Tax law, however, has relevance to the constitutional issue and to whether the majority of the members of the Church violated any duty owed to the Church.

## III. Non–Constitutional Issues

Under the rule that we do not decide constitutional issues if the matter may be decided on non-constitutional grounds,

---

**13.** In *Parish v. Maryland & Va. Milk Producers Ass'n*, 250 Md. 24, 242 A.2d 512 (1968), the Court of Appeals recognized that a member of a nonstock corporation, there, a farm cooperative, could bring a derivative action. *And see O'Donnell v. Sardegna*, 336 Md. 18, 34 n. 7, 646 A.2d 398, 406 n. 7 (1994) (listing eight decisions from other jurisdictions recognizing derivative suits by members of a nonstock, nonprofit corporation, but declining to extend standing to non-member subscribers to nonprofit health plans).

Appellants did not argue in the trial court that, absent a constitutional barrier, a derivative suit was not an available remedy. Nor was the demand/futility rule raised in the trial court. See *Werbowsky v. Collomb*, 362 Md. 581, 598–620, 766 A.2d 123, 132–44 (2001); compare *Guthrie v. Central Baptist Church of Baltimore City*, 189 Md. 692, 697–98, 57 A.2d 310, 312–13 (1948) (dismissing, where no demand made on board of trustees which had power to sue, complaint on behalf of church by moderator of members' meeting at which pastor was removed).

*Montrose Christian School Corp. v. Walsh,* 363 Md. 565, 578, 770 A.2d 111, 119 (2001), we first address two contentions by appellants.

■ Appellants say that there is no evidence that the proposed disbursements to Jewish Ministries and to KBM, and the amount to be retained by the Church, are not for proper corporate purposes or otherwise are subject to judicial intervention. We agree. The injunction hearing focused on the mortgage payoffs, and there is no basis in the evidence for concluding, even as a preliminary matter, that the majority at the special meeting violated any duty to the Church in authorizing those three applications from the sale proceeds. Nor do we accept appellees' argument that, because the majority voted to apply part of the sale proceeds to the mortgage payoffs, there is a risk, sufficient to justify appointing a receiver, that the majority will attempt to distribute some or all of the balance in violation of any duty to the Church. The argument is based on speculation and not legitimate inference. Consequently, we shall reverse in part and direct that the receiver's duties be limited to the mortgage payoffs.

■ Appellants also argue that, by approving the majority's proposed disbursement by its order docketed November 6, 2002, the trial court exhausted its power to review the majority's decision. The premise seems to be that, under the stipulation, Judge Lombardi was acting as the arbiter in some form of alternate dispute resolution procedure whose authority ended with the order of approval. That notion is to be avoided, inasmuch as an active judge "should not act as an arbitrator or mediator." Md. Rule 16–813 Canon Four H. Rather, in a case pending before it, the circuit court entered a judicial order that remained subject to discretionary reconsideration under Rule 2–535(a).

## IV. Free Exercise

■ The mortgage payments present a form of Church property dispute. The role of civil courts in the resolution of such disputes was summarized by Justice Brennan, speaking

for the Court, in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969):

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, [*School Dist. of Abington Tp., Pa. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844] (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions."

*Id.* at 449, 89 S.Ct. at 606.

The Establishment and Free Exercise Clauses of the First Amendment do not immunize religious corporations or their patrons from generally applicable taxation. *See Jimmy Swaggart Ministries v. Board of Equalization of California,* 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (sales and use taxes collectible from religious corporation); *Hernandez v.*

*Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (disallowing charitable contribution income tax deductions for "auditing" and "training" payments to Church of Scientology that, on facts, were not gifts or contributions within meaning of statute); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (requiring Amish employer to pay social security and unemployment compensation taxes).

It is by statute, 26 U.S.C. § 501(c)(3), that the Church enjoys an exemption from taxation on its income. In relevant part, that statute applies to "[c]orporations ... organized and operated exclusively for religious ... purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual[.]" "Net earnings" in § 501(c)(3) is construed to permit ordinary and necessary expenditures in the course of the exempt corporation's operations. *Birmingham Bus. College, Inc. v. Commissioner,* 276 F.2d 476, 481 (5th Cir.1960). Thus, reasonable compensation is permitted. A "private shareholder or individual" in the statute is defined as a person "having a personal and private interest in the activities of the organization." 26 C.F.R. § 1.501(a)–1(c).

Prior to the 1996 enactment of the Taxpayer Bill of Rights, P.L. 104–168, the sole civil recourse of the IRS for violation of the private inurement prohibition was revocation of the tax exempt status of the organization. See Kertz, *Executive Compensation Dilemmas in Tax–Exempt Organizations: Reasonableness, Comparability, and Disclosure,* 71 Tul. L.Rev. 819, 822 (1997) (Kertz). The 1996 legislation added intermediate sanctions. 26 U.S.C. § 4958. These are penalty taxes imposed on "excess benefit transactions." The latter are statutorily defined as

"any transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit. For purposes of the preceding sentence, an economic benefit shall not be treated

as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit."

26 U.S.C. § 4958(c)(1)(A). The penalty taxes include a twenty-five percent levy on the excess benefit payable by "any disqualified person," that is, a person "in a position to exercise substantial influence over the affairs of the organization[.]" 26 U.S.C. § 4958(a)(1) and (f)(1)(A). If the excess benefit is not "corrected" within a statutorily specified period, the tax payable by the disqualified person on the excess benefit is 200%. 26 U.S.C. § 4958(b). Correction means, *inter alia,* "undoing the excess benefit to the extent possible[.]" 26 U.S.C. § 4958(f)(6).

Numerous cases involving an IRS analysis of a religious corporation's operations to determine exemption qualification, or revocation, make plain that there is no bar to such decisions imposed by the Free Exercise Clause. See *Church of Scientology of Cal. v. Commissioner,* 823 F.2d 1310 (9th Cir.1987), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988) (affirming revocation where church transferred substantial funds to corporations controlled by its founder); *Bubbling Well Church of Universal Love, Inc. v. Commissioner,* 670 F.2d 104 (9th Cir.1981) (affirming denial of exemption when church failed to prove reasonableness of expenditures in relation to church activities); *Basic Unit Ministry of Alma Karl Schurig v. United States,* 511 F.Supp. 166 (D.D.C.1981) (affirming denial of exemption when church failed to meet burden); *Founding Church of Scientology v. United States,* 188 Ct.Cl. 490, 412 F.2d 1197 (1969), *cert. denied,* 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 422 (1970) (denying refund of taxes assessed after exemption denied where founder, *inter alia,* received ten percent of church's gross receipts); *Church of the Transfiguring Spirit, Inc. v. Commissioner,* 76 T.C. 1, 1981 WL 11377 (T.C.1981) (affirming denial of exemption when almost all of church's income was contributed by its two ministers and paid back as ostensibly non-taxable housing allowances); *People of God Community v. Commissioner,* 75 T.C. 127, 1980 WL 4628 (T.C.1980), *aff'd,* (affirming denial of

exemption when ministers' compensation was tied to church's gross receipts); *Unitary Mission Church of Long Island v. Commissioner,* 74 T.C. 507, 1980 WL 4450 (T.C.1980) 647 F.2d 163 (2d Cir.1981) (affirming denial of exemption where minister's parsonage allowance fluctuated from $13,600 to $35,650 and back to $12,000 without any evidence of change in duties); *Saint Germain Found. v. Commissioner,* 26 T.C. 648, 1956 WL 692 (T.C.1956) (overturning IRS denial of exemption after detailed review of church's expenses). *See also In re Bible Speaks,* 869 F.2d 628 (1st Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 67, 107 L.Ed.2d 34 (1989), where the court affirmed recovery of $5,500,000 in gifts to a church, on an undue influence theory, after rejecting defense that gifts were motivated by donor's religious convictions.

The inquiry into the Church's operations undertaken by the trial court at the hearing on the motion for reconsideration did not approximate the degree of review of the operations of the organizations involved in the above-cited cases. We conclude there was no constitutional violation.[14]

### V. Reasonableness Of Compensation

Appellants contend that the mortgage payoffs are reasonable "deferred" compensation. If by "deferred" appellants mean that the compensation was promised at an earlier date to be paid at a later date, then there is no evidence to support the argument. If, however, appellants mean, as we think they do, that past services may be taken into account when deter-

---

14. This holding disposes of appellants' argument that the trial court had no subject matter jurisdiction and that the parties could not confer jurisdiction by consent through the conditional settlement. We also observe that the constitutional protection, when applicable, operates to restrain courts from the exercise of jurisdiction. Maryland circuit courts have subject matter jurisdiction to adjudicate derivative actions.

Appellants also argue that the order frustrates Church operations. Because the order, as entered, reached only the cash into which the Church realty was converted, we fail to see how the operating budget of the Church was affected. There is no evidence that the building generated rental or other income in excess of the cost of operating and sustaining the building. In any event, under our mandate, the Church will have available to it the monies voted to be retained by the Church.

mining the reasonableness of additional compensation paid, but not contractually obligated, then a different, and more difficult, question is presented.

Kertz, *supra*, states that

"[t]he same type of analysis [as used in the for-profit context] is used to decide whether a nonprofit organization has made reasonable compensation payments. Reasonableness is highly dependent on the particular facts, the duties, responsibilities, training, and industry position of the executives to whom the payments in question are made."

71 Tul. L.Rev. at 838. The "most frequently cited list" of factors, Kertz at 836, for determining reasonableness of compensation is that set forth in *Mayson Mfg. Co. v. Commissioner*, 178 F.2d 115 (6th Cir.1949), where the court said:

"Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; *and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.* The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper."

*Id.* at 119 (emphasis added).

Members of a nonstock, nonprofit, hospital corporation sued on its behalf the three doctors on its staff in *Beard v. Achenbach Mem'l Hosp. Ass'n*, 170 F.2d 859 (10th Cir.1948). By contract, the doctors, collectively, were to be paid sixty-five

percent of monies received from the hospital association, but the hospital directors allowed payments exceeding that amount. In particular, the plaintiffs objected to the payment in October 1945 of a $1,500 bonus to each doctor. Affirming a judgment for the defendants, the court said:

"The payment of incentive compensation in the form of a bonus to employees who render continuous and efficient services is a common practice of long standing among large employers. While incentive compensation of that kind must bear some reasonable relation to the value of the services rendered, ordinarily a bonus which bears a reasonable relation to the value of the services rendered, which is deemed to further the best interests of the corporation, and which is paid in good faith is not a mere gift, gratuity, or reckless expenditure of which stockholders or shareholders may complain in an action of this kind. It cannot be said that under the facts and circumstances as found by the court, the payment of the [bonus] to the doctors constituted such reckless or extravagant expenditure of funds as to warrant the appointment of a receiver for the corporation or the rendition of a personal judgment against the directors authorizing the payment."

*Id.* at 863 (citation omitted).

Federal tax regulations call for a similar approach. 26 C.F.R. § 53.4958(b) "provides rules for determining the value of economic benefits for purposes of [26 U.S.C.] section 4958." In general, "[t]he value of services is the amount that would ordinarily be paid for like services by like enterprises (whether taxable or tax-exempt) under like circumstances (i.e., reasonable compensation)." 26 C.F.R. § 53.4958(b)(1)(ii)(A). The IRS regulation defining an excess benefit transaction also provides in relevant part:

"An excess benefit transaction means any transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person, and the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for provid-

ing the benefit.... For example, in determining the reasonableness of compensation that is paid ... in one year, services performed in prior years may be taken into account."

26 C.F.R. § 53.4958–4(a)(1).

 In the instant matter, the trial court applied an erroneously restrictive standard to determining the reasonableness of compensation payable to or for the benefit of Pastor Kingsley and Jeremy Kingsley. A religious or charitable corporation may take past services into consideration, with the other circumstances described above, in compensating an employee, as may a court when that compensation is challenged. The trial court's standard, that only the unpaid balance of amounts previously contractually promised may be paid in recognition of services previously rendered, seems to draw on the *cy pres* doctrine.[15]

 We see no indication in the present record that the Church's realty was held in trust. Under those circumstances, the reasonableness of the compensation properly is decided by corporate and not trust principles. *See Denckla v. Independence Found.*, 193 A.2d 538 (Del.1963). That case presented a challenge to a transfer of assets made by a nonstock, charitable corporate foundation to another foundation. In discussing the challenger's argument that the corporate foundation was governed by the same rules as a charitable trust, the court said:

"It is sometimes important to determine whether or not a gift to a charitable corporation is an absolute gift to be used by the corporation for one or more of its corporate purposes, or whether it is a gift of such nature as to make the charitable corporation trustee of a charitable trust. If the gift is outright to the corporation to be used for its corpo-

---

**15.** CA § 5–209 provides, in general, that, on dissolution of a charitable or religious corporation, a circuit court "may exercise the judicial power of cy-pres," under certain circumstances, in the disposition of corporate assets. There has been no dissolution of the Church and no evidence that dissolution is contemplated.

rate purposes no trust is involved in a technical sense. The resulting duty on the part of the corporation is to use the property solely for its corporate purposes and not to do an *ultra vires* act. 2 Bogert, *Trusts and Trustees,* §§ 324; 3 *Scott on Trusts,* §§ 348.1. In a loose sense, therefore, the assets of a charitable corporation are trust funds, but the extent and measure of that trust with respect to assets given outright to it are to be determined by the Certificate of Incorporation and By–Laws of the charitable corporation. Unless assets are given it upon express limitations and conditions, no charitable trust has been created in the technical sense."

*Id.* at 541.

The Delaware court further explained the distinction in *Oberly v. Kirby,* 592 A.2d 445 (Del.1991), a case in which a nonstock, charitable corporation sold part of its assets, consisting of stock in a for-profit corporation, to a corporate buyer that had common directors with the seller. When there is self-dealing by a trustee, the court said, the transaction is voidable, but "a court will uphold such a transaction against a beneficiary challenge only if the trustee can show that the transaction was fair and that the beneficiaries consented to the transaction after receiving full disclosure of its terms." *Id.* at 466. By contrast, in a stock corporation, "stockholders may either ratify the [interested] transaction or challenge its fairness in a judicial forum, but they lack the power automatically to nullify it." *Id.* The directors have the burden of showing the "entire fairness" of the transaction and, if that burden is met, "the transaction is protected from stockholder challenge." *Id.* The court then applied the same principles to the charitable corporation in the case before it.

We conclude that the substantial merits of the mortgage payoffs will not be determined by affirming or reversing that aspect of this case. We do not affirm because the court applied an incorrect standard. We do not reverse because the appellees have established a prima facie case through the substantial sums paid for the benefit of the Church's pastor and a member of his family. Accordingly, we shall remand in

part, in order for the circuit court to make findings of fact as to fair and reasonable compensation for all of the services of Pastor Kingsley and Jeremy Kingsley, including past services, in light of the purposes of the Church. Under the principles set forth above, the court views a spectrum and is not faced with a binary choice between zero and the amounts paid for release of the liens. Whether the parties will be permitted to introduce additional evidence on remand we leave to the discretion of the circuit court.

## VI. Further Proceedings

As guidance for the trial court on remand, we address two potential problem areas.

First, our rejection in Part IV, *supra*, of appellants' Free Exercise Clause argument resolves only the actual extent of the trial court's intervention at the hearing on the motion for reconsideration, which was limited to an inquiry concerning the terms of any employment contracts. On remand, a deeper analysis will be required. In church property cases, what at first appears to be a dispute resolvable by applying neutral legal principles on closer analysis may take the court into the theological thicket. Illustrative is *American Union of Baptists, Inc. v. Trustees of The Particular Primitive Baptist Church at Black Rock, Inc.*, 335 Md. 564, 644 A.2d 1063 (1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 785 (1995). There, at the first level of analysis, the dispute between two factions in the Black Rock Church appeared to involve a contested election and the control of church property. Analysis of the arguments of the parties, however, revealed the issue to be whether the church was extinct or had members, which, in turn, depended on "the propriety *vel non* of an 'open communion' in the Primitive Baptist faith[.]" *Id.* at 578, 644 A.2d at 1069. That issue was not within the purview of a civil court.

In the case *sub judice* Jeremy Kingsley's work as a missionary sent out by the Church, with very little financial support in the past, may raise questions as to the degree of moral

obligation, under Church tenets, that the Church had, after it came into funds, to support his continued proselytizing.[16]

Second, as a result of our mandate, the principal duty that the receiver will have under the order appealed from will be retrieving the mortgage payoffs. Presumably that will require that new mortgage loans be taken out by Pastor Kingsley and Jeremy Kingsley (who may or may not hold title to their homes in their individual names). In any event, Jeremy Kingsley is not a party to this action and, absent voluntary cooperation on his part, the receiver would have to bring a separate suit against him. On remand, the circuit court, in its discretion, may decide to have the receiver defer retrieving the mortgage payoffs until the court concludes its reexamination of its order.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED IN PART AND, IN PART, REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY THE APPELLEES, JOINTLY AND SEVERALLY.**

---

16. Among the purposes of the Church, set forth in Article I of the June 6, 1999 constitution, is "the spreading of the Gospel throughout the world through an active missions program." The "Responsibility of Believers" found in Article II, § 14, includes members' assuming "responsibility for the propagation of the gospel to all the world," through their prayers and their support with "tithes and offerings as the Lord prospers them."